IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | |
|---|---|
| FLOWERS HOLDINGS COMPANY, a General Partnership, </br></br>        Plaintiff,</br></br>   v.</br></br>MICHAEL O. LEAVITT, Secretary of Health and Human Services</br></br>        Defendant. | CASE NO. 1:01-cv-1239-WKW</br>[wo] |

**MEMORANDUM OPINION AND ORDER**

Plaintiff Flowers Holdings Company ("Flowers") filed suit under 42 U.S.C. § 1395oo(f)(1) seeking judicial review of the final determination of the Secretary of Health and Human Services (the "Secretary") that the Secretary is entitled to recoup payments made to Flowers's predecessor to compensate for depreciation. The case is presently before the court on submission on the briefs. For the reasons set forth below, the decision of the Secretary is due to be AFFIRMED.

**I. FACTS AND PROCEDURAL HISTORY**

Flowers is an Alabama partnership and the successor to Flowers Hospital, Inc., which operated Flowers Hospital in Dothan, Alabama, and four home health care agencies in Alabama. Flowers Hospital was built in 1983, and the home health care agencies were acquired in 1987. Flowers Hospital participated in Medicare until May 31, 1992, when it sold all of its assets, including its depreciable assets, to a third party. From 1983 to 1992,

Medicare reimbursed Flowers for depreciation, but after the sale, the Secretary determined that, because the sale price of certain depreciable assets exceeded their basis resulting in a gain, the depreciation claimed between 1983 and 1992 must be recaptured.[1]

Medicare provides federal reimbursement for health care services to the aged and disabled. The compensation to providers for services rendered is "the lesser of (A) the reasonable cost of such services, as determined under section 1395x(v) of this title . . . or (B) the customary charges with respect to such services." 42 U.S.C. § 1395f(b)(1) (2000).[2] The definition of reasonable cost in § 1395x(v) contains many sub-parts but begins by specifying that reasonable cost is "the cost actually incurred, excluding therefrom any part of incurred cost found to be unnecessary in the efficient delivery of needed health services, and shall be determined in accordance with regulations establishing the method or methods to be used." *Id*. § 1395x(v)(1)(A). The statute requires the Secretary to account for all direct and indirect costs in order to avoid costs properly allocated to the care of Medicare patients being shifted to non-Medicare patients. *Id.*

In the calculation of reasonable cost, providers are entitled to "[a]n appropriate allowance for depreciation on buildings and equipment used in the provision of patient care."

---

[1] Flowers admits the sale resulted in a gain as defined by Medicare regulations. (*See* Compl. ¶ 16.)

[2] Flowers sold its assets fifteen years ago, and as this opinion details there have been changes to the relevant statutes since then. For purposes of clarity, citations to statutes are to the most recent official code, 2000, if the statutory language has not changed in the intervening time period.

42 C.F.R. § 413.134(a) (1992).[3] Medicare reimburses a provider for a percentage of the depreciation on that provider's assets based on the proportion of the provider's services rendered to Medicare beneficiaries.

Depreciation is calculated using the straight-line method. "Under the straight-line method of depreciation, the cost . . . of the asset, less its estimated salvage value, if any, is determined first. Then this amount is distributed in equal amounts over the period of the estimated useful life of the asset." *Id.* § 413.134(b)(3). For example, if an asset were purchased at $300,000, had a salvage value of $0, and an estimated useful life of 30 years, it would depreciate at a rate of $10,000 per year. *See Hoodkroft Convalescent Ctr., Inc. v. N.H., Div. of Human Servs.*, 879 F.2d 968, 969 (1st Cir. 1989).

While Medicare authorizes payments to providers for depreciation, the regulations permit the Secretary to recapture payments for depreciation if the provider later experiences a gain on the sale of the asset:

> If disposal of a depreciable asset results in a gain or loss, an adjustment is necessary in the provider's allowable cost. The amount of a gain included in the determination of allowable cost is limited to the amount of depreciation previously included in [the provider's] Medicare allowable costs. The amount of a loss to be included is limited to the undepreciated basis of the asset permitted under the program.

42 C.F.R. § 413.134(f)(1).[4] The regulation also explains how the amount of depreciation is

---

[3] Except where explicitly noted, subsequent citations to the Code of Federal Regulations will be citations to the 1992 version, which controls the decision.

[4] The regulation has since been amended. "No gain or loss is recognized on either the sale or the scrapping of an asset that occurs on or after December 1, 1997." 42 C.F.R. § 413.134(f)(1) (2007).

to be calculated:

> (A) The total amount of gains or losses shall be allocated to all reporting periods under the Medicare program, based on the ratio of the depreciation allowed on the assets in each reporting period to the total depreciation allowed under the Medicare Program.
>
> (B) The results of this allocation are multiplied by the ratio of Medicare reimbursable cost to total allowable cost for each reporting period.
>
> (C) The results of this multiplication are then added.

*Id.* § 413.134(f)(2)(iii). The adjustment to the allowable cost ensures "that Medicare pays the actual cost the provider incurred in using the asset in patient care." Depreciation: Allowance for Depreciation Based on Asset Costs, 44 Fed. Reg. 3980 (Jan. 19, 1979). However, the regulation does not define depreciation, other than to require the straight-line method, and does not account for or allow any adjustments to depreciation at recapture. "The total amount of gains or losses" is the starting point for calculating depreciation to be recaptured. 42 C.F.R. § 413.134(f)(1)(A). "Gain" is a fixed element in the depreciation recapture calculus.

In 1984, Congress enacted a statute that added a new provision to the definition of reasonable cost, which required the Secretary to use the recapture regulations in place: "Such regulations shall provide for recapture of depreciation in the same manner as provided under the regulations in effect on June 1, 1984."[5] Deficit Reduction Act of 1984 ("DEFRA"), Pub.

---

[5] Between 1984 and 1992, the recapture regulation was moved to a different section, and there was a grammatical change. *Compare* 42 C.F.R. § 405.415(f) (1984) ("The amount of a gain included in the determination of allowable cost shall be . . . .") *with* 42 C.F.R. § 413.134(f) ("The amount of a gain included in the determination of allowable cost is . . . ."). However, the substance of the regulations remained the

L. No. 98-369, § 2314, 98 Stat. 494, 1079 (1984) (codified at 42 U.S.C. § 1395x(v)(1)(O)(ii) (1994)) (repealed 1997).[6] The Secretary is authorized to create regulations to make retroactive adjustments when "the aggregate reimbursement produced by methods of determining costs proves to be either inadequate or excessive." 42 U.S.C. § 1395x(v)(1)(A) (2000); *see* 42 C.F.R. § 405.1803(c) (authorizing retroactive adjustments). Congress provided no statutory standard by which to measure "inadequate or excessive" reimbursement.

Medicare does not directly reimburse providers; instead, a fiscal intermediary, under contract with the Secretary, makes periodic payments to providers for services furnished to Medicare patients. *See* 42 U.S.C. § 1395h (2000). At the end of its fiscal year, the provider submits a "cost report" to the intermediary showing the costs incurred and the portion of these costs that are to be allocated to Medicare. 42 C.F.R. §§ 413.20(b), 413.24(f). The intermediary audits the cost report to determine the total amount of reimbursement due to the provider. *Id.* § 405.1803(a).

If a provider disagrees with the intermediary's decision, it can challenge it before the Provider Reimbursement Review Board ("PRRB"). 42 U.S.C. § 1395oo (2000). The PRRB's ruling is the final decision of the Secretary, unless the Secretary reverses, affirms,

---

same. In September 1992, there was a subsequent amendment to the regulation, but that change is irrelevant to the analysis here because Flowers sold its assets in May 1992.

[6] Congress later eliminated this provision. *See* Balanced Budget Act of 1997, Pub. L. No. 105-33 § 4404(a), 111 Stat. 251, 400 (1997). The regulation was also amended. *See supra* note 4. Because DEFRA ceased to be the applicable law after 1997, the court's holding here applies to transactions occurring between 1984 and 1997 – after the enactment of DEFRA but prior to the passage of the Balanced Budget Act of 1997.

or modifies it. *Id.* § 1395oo(f)(1). The provider can seek judicial review of the Secretary's final decision by bringing an action in United States District Court in the district in which the provider is located or in the District Court for the District of Columbia. *Id.*

After Flowers sold its assets, it filed a final Medicare cost report in which it did not recognize the effect of the gain on the sale of the depreciated assets and did not reduce its allowable costs by taking into account such gain. After auditing the report, Blue Cross/Blue Shield of Alabama ("Blue Cross"), the fiscal intermediary, sought to recapture $11,252,694 in depreciation payments to Flowers because it concluded the amount of depreciation reimbursed was excessive in view of the gain on the sale of the depreciable assets. The parties later agreed to reduce the amount to $9,110,302. Flowers appealed the intermediary's decision, and the PRRB ruled in its favor, finding that some of the gain on the sale was due to inflation, and reduced the amount to be recaptured by $5.2 million to approximately $3.9 million. Flowers also sought to have the amount of depreciation recaptured reduced because it claimed that some of the gain on the sale was due to changed market conditions. Though Flowers provided expert testimony, the PRRB found Flowers did not provide sufficient evidence to support the claim and ruled against Flowers regarding market conditions.[7]

The Secretary, acting through the Deputy Administrator of the Centers for Medicare and Medicaid Services, reversed the PRRB's decision to reduce the recapture of depreciation by $5.2 million, returning the amount to be recaptured to $9,110.302. This decision

---

[7] Also at issue was whether the intermediary erred by not recalculating the return on equity. However, Flowers has not sought judicial review of this issue.

constituted final agency action. Flowers then timely filed this lawsuit seeking review of the Secretary's decision. The parties agreed to submission of the case on the briefs, (Doc. # 14), and it is fully briefed and ripe for review.

## II. JURISDICTION

The court has jurisdiction over this civil action. Section 1395oo(f) provides that providers may "obtain judicial review of any final decision of the Board, or of any reversal, affirmance, or modification by the Secretary, by a civil action commenced within 60 days of the date on which notice of any final decision by the Board or any reversal, affirmance, or modification by the Secretary is received." 42 U.S.C. § 1395oo(f)(1) (2000). Flowers commenced this action within 60 days of the Secretary's final decision. Venue is proper in the Middle District of Alabama as it is "judicial district in which the provider is located." *Id.*

## III. STANDARD OF REVIEW

The Medicare statute provides that a federal district court reviews the final decision of the PRRB, or the Secretary's reversal, affirmance, or modification of the PRRB's decision, pursuant to "chapter 7 of Title 5," which is the Administrative Procedure Act ("APA"), 5 U.S.C. § 706. 42 U.S.C. § 1395oo(f)(1) (2000). According to the APA, "[t]he reviewing court shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be – (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law [or] . . . (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706 (2000).

In reviewing an agency's interpretation, courts begin by analyzing the language of the statute: "If the intent of Congress is clear, that is the end of the matter." *Chevron U.S.A, Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 842 (1993). If Congress has not directly addressed the matter or if the statute is ambiguous, courts "generally will defer to a permissible interpretation espoused by the agency entrusted with its implementation." *Good Samaritan Hosp. v. Shalala*, 508 U.S. 402, 414 (1993). "[A] court may not substitute its own construction of a statutory provision for a reasonable interpretation made by the administrator of an agency." *Chevron*, 467 U.S. at 844. "An agency's interpretation is reasonable and controlling unless it is arbitrary, capricious, or manifestly contrary to the statute." *Cadet v. Bulger*, 377 F.3d 1173, 1185 (11th Cir. 2004) (internal quotation marks and citation omitted). As the Eleventh Circuit has noted, "the Secretary has amassed considerable expertise in the health care area and absent a strong showing by the plaintiff, this court will not substitute its judgment for that of the agency." *Univ. Health Servs., Inc. v. Health & Human Servs.*, 120 F.3d 1145, 1148 (11th Cir. 1997) (internal quotation marks and citation omitted). "[T]he Secretary's interpretation of her own regulations are [sic] 'controlling unless plainly erroneous or inconsistent with the regulation.'" *Id.* at 1148-49 (quoting *Auer v. Robbins*, 519 U.S. 452, 461 (1997)).

### IV. DISCUSSION

Flowers claims that the Secretary's interpretation of 42 C.F.R. § 413.134(f) is unreasonable because it contradicts the Medicare Act, and Flowers relies on the Eleventh

8

Circuit's opinion in *Mercy Community Hospital v. Heckler*, 781 F.2d 1552 (11th Cir. 1986), to support its position. The Secretary argues that after the passage of DEFRA *Mercy* no longer controls the court's analysis and that the Secretary's interpretation is consistent with the underlying statute. The court first analyzes the *Mercy* decision to determine if it applies to this transaction and then determines if the Secretary's interpretation of the regulations is reasonable and consistent with the underlying statute.

### A.   *The* **Mercy** *Decision*

In 1986, the Eleventh Circuit issued its decision in *Mercy*, striking down as unreasonable the Secretary's interpretation that he was entitled to recapture payments made for depreciation when a provider experienced a gain upon selling its assets. *Mercy Cmty. Hosp.*, 781 F.2d at 1558. After the owner of Mercy Community Hospital sold its assets for a gain of more than three million dollars, the fiscal intermediary sought to recapture depreciation payments. *Id.* at 1553. When the hospital was sold in 1977, DEFRA had not yet been enacted[8] and the Secretary had in place different regulations[9] than those at issue in

---

[8] When the Eleventh Circuit rendered its decision in 1986, DEFRA had been enacted. However, the Eleventh Circuit's opinion does not reference DEFRA.

[9] The relevant regulation at the time of the Mercy Community Hospital sale provided :

Gains and losses from the disposal of depreciable assets while a provider is participating in the program, or within 1 year after the provider terminates participation in the program, are to be included in the determination of allowable cost. The extent to which such gains and losses are includable is calculated on a proration basis recognizing the amount of depreciation charged under the program in relation to the amount of depreciation, if any, charged or assumed in a period prior to the provider's participation in the program, and in the period after the provider's participation in the program when the sale takes places within 1 year after termination.

9

this case.

The issue in *Mercy* was "whether [the Secretary's interpretation of the depreciation recapture regulations] is 'reasonably related to the purposes of the enabling legislation.'" *Id.* at 1556 (quoting *Mourning v. Family Publ'ns Serv., Inc.*, 411 U.S. 356, 369 (1973)). The court noted that the statute required Medicare providers to be reimbursed for "reasonable costs incurred" and that reasonable cost is statutorily defined as "'the cost actually incurred, excluding therefrom any part of incurred cost found to be unnecessary in the efficient delivery of needed health services." *Mercy Cmty. Hosp.*, 781 F.2d at 1553 (quoting 42 U.S.C. § 1395x(v)(1)(A)). The Secretary sought to recapture payments for depreciation on the theory that since the provider experienced a gain on the sale of its assets it never actually incurred depreciation. *Mercy Cmty. Hosp.*, 781 F.2d at 1556. However, the court pointed out that when an asset sells for more than its depreciated book value, the increase in value may be due to increased demand, inflation, changed market conditions, or a combination of these factors, and that even with the increase in value, the asset may have depreciated. *Id.* at 1558. The court found the Secretary ignored these other factors and "retroactively deprive[d] providers of reimbursements made for the consumption of their assets without regard to whether those payments in fact overcompensated the provider for reasonable costs actually incurred." *Id.* Because the Secretary had failed to compensate the provider for costs actually incurred, his interpretation was "clearly contrary to the statutory

---

*Mercy Cmty. Hosp.*, 781 F.2d at 1553-1554 (quoting 42 C.F.R. § 405.415(f)(1977)).

mandate."[10]  *Id.*

## B.     *The Status of the* Mercy *Decision*

If *Mercy* governs transactions occurring between 1984 and 1997,[11] this court must find the Secretary's interpretation unreasonable because it fails to compensate Flowers for costs actually incurred in providing services to Medicare recipients. The Secretary argues that DEFRA "overruled" *Mercy*.[12] (*See* Def.'s Br. 7.) Because both the relevant regulations and statute have changed since the sale of assets in *Mercy*, the court first examines the effect of the changes to the regulation and then to the statute.

It is undisputed that the regulation at issue here, 42 C.F.R. § 413.134(f), is different from the one at issue in *Mercy*. However, the revised regulation had been adopted when the Eleventh Circuit decided *Mercy*, and the court stated that its analysis would remain the same under the amended regulation: "[W]e find it as difficult to discern any clear regulatory authority for the Secretary's position in this case in the amended version of the regulation as

---

[10] Other circuits have disagreed with the *Mercy* decision and have found the Secretary's interpretation to be reasonable. *See St. Mark's Charities Liquidating Trust v. Shalala*, 141 F.3d 978, 982-83 (10th Cir. 1998); *Creighton Omaha Reg'l Health Care Corp. v. Sullivan*, 950 F.2d 563, 565-66 (8th Cir. 1991); *Stewards Found. v. United States*, 654 F.2d 28, 33 (Ct. Cl. 1981); *Prof'l Med. Care Home, Inc. v. Harris*, 644 F.2d 589, 593-94 (7th Cir. 1980). *But see Whitecliff, Inc. v. Shalala*, 20 F.3d 488, 492-93 (D.C. Cir. 1994).

[11] The court uses this date range because this is the period when DEFRA was the law.

[12] "Overruled" is not the proper terminology. "Overrule" is defined as: "(Of a court) to overturn or set aside (a precedent) by deciding that it should no longer be controlling law." Black's Law Dictionary 1136 (8th ed. 2004). Additionally, DEFRA was enacted before *Mercy* was decided. Is it metaphysically possible for Congress to overrule or supersede a decision that the Eleventh Circuit had not yet made? That question remains for another day and discipline, but the court does find *infra* that *Mercy* does not control transactions that occurred after DEFRA was enacted.

11

in the version effective during the cost years at issue in this case." *Mercy Cmty. Hosp.*, 781 F.2d at 1554 n.1. While this statement is *dicta*, it succinctly declares that the Secretary's interpretation would still be unreasonable if only the *regulation* had changed. The Secretary's interpretation in *Mercy* was struck down as inconsistent with the "statutory mandate," *id.* at 1556-57; a change to the *regulation* does not ameliorate the inconsistency with the enabling *legislation*.

In fact, at the time *Mercy* was decided Congress had corrected with DEFRA, in a backhanded way, the inconsistency between the regulations and the enabling legislation that the court faced in *Mercy*. Prior to DEFRA, the statute on reasonable cost did not contain a specific provision regarding depreciation recapture; the court in *Mercy* applied the general definition of "cost actually incurred." *See Mercy Cmty. Hosp.*, 781 F.2d at 1558 ("[T]he Secretary's position retroactively deprives providers of reimbursements made for the consumption of their assets without regard to whether those payments in fact overcompensated the provider for *reasonable costs actually incurred*. Such an interpretation of Regulation 405.415(f) is clearly contrary to the statutory mandate." (emphasis added)). DEFRA added a subsection to the definition of reasonable cost, which stated that "regulations shall provide for recapture of depreciation in the same manner as provided under the regulations in effect on June 1, 1984." 42 U.S.C. § 1395x(v)(1)(O)(ii) (1994). The regulations in effect on June 1, 1984, authorized the Secretary to recapture depreciation when the provider experienced a gain on the sale. *See* 42 C.F.R. § 413.134(f). Though this

statutory change had recently occurred, it was not before the *Mercy* court and was not addressed by it.

Another deficiency in the Secretary's regulations also guided the *Mercy* court to find the Secretary's interpretation unreasonable in that case.

> Although [the pre-DEFRA] regulation required that gains and losses realized on the disposal of a depreciated asset be included in determining reimbursable costs, neither it nor any other regulation specified the appropriate procedure for computing the relevant gain or loss or the appropriate method for making retroactive adjustments to allowances already paid for depreciation.

*Id.* at 1556. Nevertheless, the court acknowledged that the Secretary recognized this deficiency and had, by the time of the decision in *Mercy*, "amended the applicable regulation subsequent to the cost year at issue here." *Id.* Thus, after the enactment of DEFRA, the Secretary's discretion was better informed by Congress and the Secretary's own regulation than it had been when the *Mercy* transaction occurred.

The court in *Mercy* found that the Secretary's interpretation was inconsistent with the pre-DEFRA statute defining reasonable cost as "cost actually incurred." The Secretary has correctly observed that "[t]he *Mercy* decision involves a cost year prior to Congress' enactment of DEFRA and is inconsistent with this later statutory mandate to apply the established recapture provisions contained in the regulation." (Doc. # 1 Ex. B, at 6.) To find that the *Mercy* analysis still controls, this court would have to ignore DEFRA and the resulting changes in regulations addressing some of the regulatory issues that troubled the *Mercy* court. The court concludes that the instant scenario is not located in the *Mercy*

landscape.

### C.     *The Secretary's Interpretation*

Therefore, the court evaluates whether the Secretary's interpretation was reasonable given the relevant statute and regulations. DEFRA specifies that the Secretary must use the depreciation recapture regulations in place on June 1, 1984. In reviewing the Secretary's interpretation, the court applies the *Chevron* two-step analysis. The court first determines "whether Congress has directly spoken to the precise question at issue," *Chevron*, 467 U.S. at 842, which, in this case, is whether the Secretary is entitled to recapture depreciation payments when the provider sells a depreciable asset for more than its cost minus depreciation taken, even though the gain may be due to inflation or changing market conditions. The relevant provision of DEFRA does not speak directly to this issue but directs the Secretary to the regulations to be used in making the determination. *See* 42 U.S.C. § 1395x(v)(1)(O)(ii) (1994) (repealed 1997).

Congress having not spoken directly to the precise question, the court moves to the second step and examines whether the Secretary's interpretation "is based on a permissible construction of the statute," *Chevron*, 467 U.S. at 843. The Secretary's interpretation is that Medicare is not required to reimburse providers for depreciation actually incurred when the depreciable asset is sold for a gain, to the extent of that gain. The question is whether the Secretary's interpretation is permissible given the Medicare statute, which requires Medicare to reimburse a provider for reasonable costs. *See* 42 U.S.C. § 1395f(b)(1) (2000). The

14

parties disagree about what the term "reasonable cost" means in the context of depreciation recapture. Flowers claims that reasonable cost is cost the provider actually incurred while the Secretary takes the position that reasonable cost is defined pursuant to the regulations as the difference between the sale price and the depreciated basis. The parties draw their positions from the statute defining reasonable cost.[13]

While the provision of DEFRA addressing recapture of depreciation is not a model of legislative clarity, foresight, or intentionality, it nevertheless changed the statutory definition of reasonable cost to require the Secretary to recapture depreciation payments. Essentially, Congress codified the regulations previously adopted by the Secretary. Were they neatly codified, the following core provisions would govern recapture of depreciation: (1) recapture of depreciation is mandated: "Such regulations shall provide for recapture of depreciation," 42 U.S.C. § 1395x(v)(1)(O)(ii) (1994) (repealed 1997); (2) if disposal of a depreciable asset results in a gain or a loss, an adjustment is necessary in the provider's allowable cost, 42 C.F.R. § 413.134(f)(1); (3) "[t]he total amount of gains" is to be used in the calculation, *id.* § 413.134(f)(2)(iii);[14] and (4) the amount of the gain is limited to the amount of depreciation previously included in the provider's Medicare allowable cost. *Id.* § 413.134(f)(1).

The *Chevron* question is whether the Secretary's interpretation is based upon a

---

[13] Flowers bases its argument on § 1395x(v)(1)(A) while the Secretary points to the clause added by DEFRA, which amended § 1395x(v).

[14] Not only is "gains" undefined, it is not explicitly subject to adjustment for any reason.

permissible construction of the statute. It is a principle of statutory interpretation that "a more specific statute will be given precedence over a more general one." *Manstream v. U.S. Dept. of Agric.*, 649 F. Supp. 874, 882 (M.D. Ala. 1986) (quoting *Busic v. United States*, 446 U.S. 398, 406 (1980)). The definition of reasonable cost in DEFRA applies specifically and only to depreciation recapture, whereas "cost actually incurred" is a broader definition pre-existing the enactment of DEFRA that applies to all types of expenses a provider can incur. Because the definition in DEFRA is more specific, it applies here. Accordingly, DEFRA clarified the law by not requiring the Secretary to consider an extrinsic factor – inflation – in calculating depreciation recapture payments.

Flowers argues that the Secretary's interpretation is unreasonable because it does not consider the effects of two extrinsic market factors – inflation and changed market conditions – when calculating gain. The regulation, which specifies the procedure for calculating the adjustment to allowable cost after the sale of an asset, states that "[t]he total amount of gains or losses shall be allocated." 42 C.F.R. § 413.134(f)(2)(iii)(A). The Secretary's interpretation of "total," in reference to gains, is that it means "total." The Secretary has rejected Flowers's suggestion that "total" gains somehow means "less than total." Because "gains" is undefined in the regulation (subsequently birthed into a statute, still undefined), the court gives the word its "'ordinary or natural' meaning." *Leocal v. Ashcroft*, 543 U.S. 1, 9 (2004) (quoting *Smith v. United States*, 508 U.S. 223, 228 (1993)). The ordinary meaning of gain is the "[e]xcess of receipts over expenditures or of sale price over cost."

Black's Law Dictionary 700 (8th ed. 2004).[15] Therefore, the Secretary's interpretation of total gain is correct. Deferring to the Secretary's "considerable expertise" in these matters, and in view of the codified regulations, the court finds that the Secretary's actions were not arbitrary, capricious, or an abuse of discretion, when the Secretary did not consider inflation or market factors in calculating reasonable cost, because the interpretation is consistent with the requirements of DEFRA.

Restating its argument somewhat, Flowers argues that the Secretary's interpretation leaves it "with no compensation for the wear, tear, and obsolescence of its assets incurred in treating Medicare beneficiaries."[16] (Pl.'s Br. 3.) However, Flowers's argument misses the point that the law does not *require* the Secretary to adjust the gain to reflect inflation or changed market conditions after DEFRA. To the extent that Flowers argues that it *should* be reimbursed, it presents a policy argument more appropriately addressed to Congress. Moreover, though it was not argued by either party, it does not go unnoticed that the Congress and the Secretary "corrected" (in the view of Flowers) the recapture provision in 1997. Congress eliminated the depreciation recapture provision in DEFRA with the

---

[15] In this case, cost is depreciated cost, or cost less depreciation.

[16] The PRRB found that some of the gain in market value was due to inflation and needed to be reduced, but it rejected Flowers's argument that the gain was also due to changing market conditions. The PRRB found that Flowers had not produced sufficient evidence to support this claim. Flowers claims the Secretary summarily reversed the PRRB, after the PRRB found for it on this issue. However, Flowers ignores that the Secretary clearly found against it on this issue: "the Medicare law and regulation does not recognize the possible effects of inflation **and market conditions** in computation of depreciation expense or gains and losses on sale of depreciable assets." (Doc. # 1 Ex. B. at 6 (emphasis added).) The court finds the Secretary's decision explicitly addressed Flowers's argument regarding changing market conditions.

Balanced Budget Act of 1997. *See* Balanced Budget Act of 1997, Pub. L. No. 105-33 § 4404(a), 111 Stat. 251, 400 (1997). The Secretary then amended the recapture regulation: "No gain or loss is recognized . . . after December 1, 1997." 42 C.F.R. § 413.134(f)(1) (2007). Flowers in effect asks this court to backdate these changes to 1992, which is a power the court does not possess and which would result in the court ignoring legislation passed by Congress and regulations codified by the Secretary.

Flowers also argues that the Secretary's decision should be reversed because the regulation does not *require* the Secretary to recapture *all* of the gain the provider experienced. It argues that § 413.134(f)(1) only sets a limit on the amount of depreciation the Secretary can recapture. This argument ignores the requirement that the "total amount of gain" shall be used in the calculation. *Id.* 413.134(f)(2)(iii)(A). Even assuming that Flowers is correct and the Secretary is not *required* to recapture the entire gain, the Secretary has not acted arbitrarily or capriciously in seeking to recapture all depreciation payments when the gain is greater than the depreciation taken. The Secretary has considerable discretion in the interpretation of his own regulations, *Univ. Health Servs.*, 120 F.3d at 1148, and Flowers's showing is insufficient to overrule that discretion.

The conclusion reached here is consistent with the D.C. Circuit's decision in *Whitecliff*. *See Whitecliff*, 20 F.3d 488. *Whitecliff* presented the identical issue except the transaction occurred before DEFRA was enacted. The court in *Whitecliff* followed the *Mercy* analysis and found the Secretary had failed to reimburse for cost actually incurred. *Id.* at 492.

The court recognized that its analysis would be different if the transaction had occurred after DEFRA's enactment: "Congress has subsequently explicitly endorsed the Secretary's regulations, so presumably it is not necessary for the Secretary to struggle with the problem in the future." *Id.* at 494. This analysis, albeit *dicta*, supports the instant conclusion that the Secretary's interpretation is consistent with the statutory scheme created by DEFRA.

Flowers claims that the Secretary has in the past applied *Mercy* as the relevant law and should do so now. *See Rehab. Inst. of W. Fla.*, HCFA Admin. Dec., Medicare & Medical Guide (CCH) ¶ 38,426 (Mar. 16, 1990). However, the *Rehabilitation Institute* decision, like *Mercy*, analyzed a transaction that occurred before DEFRA's enactment, and the Secretary specifically noted that DEFRA had not been enacted at the time of the transaction. *See id.* Accordingly, the *Rehabilitation Institute* decision is not on point, nor does it support Flowers's argument that the Secretary has acted inconsistently.

The court is conscious of the stakes involved here – certainly high enough to make Flowers understandably cry "*Mercy*!" Nevertheless, for these reasons and given the Secretary's considerable expertise, the court concludes that the Secretary's interpretation is neither arbitrary nor capricious and is factually supported.[17] The decision in *Mercy* does not control the court's decision here because the relevant statutory authority has changed, and

---

[17] Flowers argues in its reply brief that the Secretary's interpretation is unreasonable because it creates the absurd result of treating hospitals that own depreciable assets and those that lease depreciable assets differently. "It is well settled that a party cannot argue an issue in its reply brief that was not preserved in its initial brief." *Tallahassee Mem'l Reg'l Med. Ctr. v. Bowen*, 815 F.2d 1435, 1446 n.16 (11th Cir. 1987). Accordingly, this argument is not before the court.

the Secretary's interpretation is reasonable.

## IV.  CONCLUSION

Accordingly, the court hereby AFFIRMS the final administrative decision of the Secretary.

An appropriate judgment will be entered.

DONE this 31st day of March, 2008.

                                        /s/   W.  Keith Watkins
                                    UNITED STATES DISTRICT JUDGE